UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------

MELISSA LOZADA,

                         Plaintiff,

            v.

CHARLES WEILMINSTER — TROOPER 1287,
CHRISTOPHER NOLAN — TROOPER 5219,
WANTAGH FIRE DISTRICT, COURTNEY
BARANOWSKI, JEFF LINDGREN, and
AMANDA HUTCHISON,

                        Defendants.

--------------------------------------------------------------

**<u>MEMORANDUM & ORDER</u>**
11-CV-2049 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Melissa Lozada commenced the above-captioned action on April 27, 2011,

against New York State Troopers Charles Weilminster and Christopher Nolan, (collectively,

"State Defendants"), the Wantagh Fire District, and forty-one volunteer firefighters from the

Wantagh Fire District, including Courtney Baranowski,[1] Jeff Lindgren and Amanda Hutchison,[2]

(collectively, "Fire District Defendants").[3]  Plaintiff's Complaint alleges violations of her civil

---

      [1]  Defendant Courtney Baranowski was initially identified as "Courtney Whitefield" in the Complaint, and has since changed her last name from either Whitefield or Whitfield to Baranowski.  (*See* FD Def. Mem. 4.)

      [2]  Defendant Amanda Hutchison was incorrectly identified as "Amanda Hutchinson" in the Complaint.

      [3]  The other thirty-eight original Defendants entered into a stipulation of discontinuance executed on March 6, 2013, and filed with this Court on April 3, 2013.  (Docket Entry No. 35.) Despite this fact, the thirty-eight original Defendants joined the Fire District Defendants' motion for summary judgment.  Those thirty-eight Defendants have been dismissed from this action, (Docket Entry No. 90), and thus have no basis on which to move before this Court for summary judgment.

rights guaranteed by the First, Fourth, Fifth and Fourteenth Amendments of the United States Constitution.[4]  Specifically, Plaintiff brings claims for (1) violation of her First Amendment right to freedom of speech; (2) violations of her Fourth Amendment rights caused by (i) use of excessive force, (ii) false arrest, and (iii) malicious prosecution; (3) violations of her procedural due process rights protected by the Fifth and Fourteenth Amendments; (4) conspiracy; and (5) municipal liability pursuant to 42 U.S.C. § 1983.  Plaintiff also brings claims for negligence and *respondeat superior* liability pursuant to New York state law.  State Defendants and Fire District Defendants separately move for summary judgment.[5]  For the reasons discussed below, the Court grants State Defendants' motion in part and denies it in part, and grants Fire District Defendants' motion in its entirety.

## I.  Background

### a.  State Defendants

At the time of the events which are the basis for this action, State Defendants were New York State Troopers employed by the New York State Police, and were acting both under color of state law and under color of their authority as New York State Troopers.  (State Def. 56.1 ¶ 3;

---

[4]  Plaintiff alleges in the Complaint that her claim brought pursuant to 42 U.S.C. § 1983 is also for violations of her rights guaranteed by the same amendments to the Constitution of the State of New York.  (Compl. ¶ 30.)  It is not clear to the Court what specific provisions of the New York State Constitution Plaintiff alleges were violated.  None of the parties addressed this claim on the motion for summary judgment.  To the extent Plaintiff attempts to pursue her Section 1983 action for violations of the New York State Constitution, Section 1983 claims are not the appropriate vehicle for such claims.  *See Shakhnes v. Berlin*, 689 F.3d 244, 250 (2d Cir. 2012) ("Section 1983 creates a cause of action against any person who, acting under color of state law, abridges 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." (quoting 42 U.S.C. § 1983)).

[5]  In her opposition papers, Plaintiff argues that summary judgment is warranted in her favor.  (Pl. Opp'n Mem. 2.)  For the reasons set forth in this Memorandum and Order, to the extent Plaintiff has moved for summary judgment, her motion is denied.

Pl. State 56.1 ¶ 3.[6])  Neither of the State Defendants was the supervisor of the other, and neither

had trained the other.  (State Def. 56.1 ¶ 12; Pl. State 56.1 ¶ 12.)

### b.  Fire District Defendants

Baranowski and Hutchison were certified emergency medical technicians ("EMTs") who

volunteered for the Wantagh Fire District.  (FD Def. 56.1 ¶ 15, 82; Pl. FD 56.1 ¶ 15, 82.)  At the

time of the events at issue in this action, Baranowski was the senior medical personnel in the Fire

District, and she had taken additional training courses to become "critical care certified."  (FD

Def. 56.1 ¶ 84; Pl. FD 56.1 ¶ 84.)  Lindgren was a volunteer fire chief at the time of the incident

that forms the basis for this action.  (Tr. of Dep. of Jeff Lindgren, dated Feb. 11, 2013, annexed

to FD Def. Mot. as Ex. J ("Lindgren Dep.") 7:21–8:14.)  As Chief in charge of the scene,

Lindgren was in charge of scene safety and ensuring that the members of the Wantagh Fire

District remained safe, and ensuring that the "aided" — Plaintiff, in this case — received proper

medical attention.  (FD Def. 56.1 ¶¶ 44–45; Pl. FD 56.1 ¶¶ 44–45.)

All EMTs at the Wantagh Fire District have regular meetings at which training topics are

discussed, and may have received refresher training about how to properly complete certain

forms, including a New York state-mandated Pre-hospital Care Report ("PCR"), and specifically

the refusal of medical attention portion on the form ("RMA").  (FD Def. 56.1 ¶ 86; Pl. FD 56.1

¶ 86.)  According to Defendants, generally, if a patient refuses to sign the RMA portion of the

---

[6]  Plaintiff submitted one statement of material facts which responds to both the State
Defendants' statement of undisputed facts pursuant to Rule 56.1 and the Fire District
Defendants' statement pursuant to Rule 56.1, and also presents her own counter-statement of
facts.  (*See* Pl. Rule 56.1 Statement in Opp'n to Summary Judgment Mot., Docket Entry No.
88-17.)  Each of these three sections of the document contains numbered paragraphs beginning
with number 1.  For clarity, the Court refers to each set of numbered paragraphs as follows:
Plaintiff's responses to the State Defendants will be cited as "Pl. State 56.1," Plaintiff's
responses to the Fire District Defendants will be cited as "Pl. FD 56.1" and Plaintiff's own
counter-statement, to which Defendants object as improper, will be cited as "Pl. Counter 56.1."

PCR, the EMTs do their best to try to get them to sign, but will get a supervisor or police officer to witness the refusal if the patient both insists and is of sound mind. (FD Def. 56.1 ¶ 29; Tr. of Dep. of Courtney Baranowski dated Jan. 4, 2013, annexed to FD Def. Mot. as Ex. H ("Baranowski Dep.") 28:2–29:5; Tr. of Dep. of Amanda Hutchison dated Feb. 15, 2013, annexed to FD Def. Mot. as Ex. I ("Hutchison Dep.") 35:4–36:17; Tr. of Dep. of Jason Jackowitz dated Feb. 18, 2013, annexed to FD Def. Mot. as Ex. K ("Jackowitz Dep.") 22:2–24:20, 31:11–32:6; Lindgren Dep. 59:2–10.) Plaintiff disputes that this is the typical procedure in which fire district members are trained, arguing that they are trained to "compel a patient, by any means necessary, to sign the RMA for[m] in order to shield themselves from liability," and will involve law enforcement to arrest the patient if she refuses to sign the form. (Pl. FD 56.1 ¶ 29.)

### c. April 28, 2009 incident

On April 28, 2009, at approximately 12:38 AM, Plaintiff was involved in a motor vehicle accident. (State Def. 56.1 ¶ 8; Pl. State 56.1 ¶ 8; FD Def. 56.1 ¶ 1; Pl. FD 56.1 ¶ 1.) Plaintiff, who was alone in her vehicle and had been falling asleep while driving, ran her car off of the roadway and into a guardrail when she failed to navigate an exit ramp at Exit 28 on the westbound Southern State Parkway. (State Def. 56.1 ¶ 8; Pl. State 56.1 ¶ 8; *see also* FD Def. 56.1 ¶¶ 2–3.) The impact caused the Plaintiff's airbag to deploy, and Plaintiff raised her arms and hands in front of her face to protect herself from injuries resulting from the airbag. (State Def. 56.1 ¶ 9; Pl. State 56.1 ¶ 9; FD Def. 56.1 ¶ 4; Pl. FD 56.1 ¶ 4.) The inflating airbag left a burn mark on the inside of Plaintiff's left elbow. (State Def. 56.1 ¶ 9; Pl. State 56.1 ¶ 9; FD Def. 56.1 ¶ 4; Pl. FD 56.1 ¶ 4.) According to Plaintiff, the airbag did not touch her face or hands, and Plaintiff was otherwise uninjured. (Pl. Counter 56.1 ¶¶ 14, 16; Tr. of Pl. Dep., dated Oct. 10, 2012, annexed to FD Def. Mot. as Ex. F. ("Pl. Dep.") 52:3–8.) Plaintiff's vehicle eventually

came to rest with a driver's side tire touching the guardrail; Plaintiff was initially unable to open the driver's side door.  (FD Def. 56.1 ¶ 5; Pl. FD 56.1 ¶ 5.)  Plaintiff called 911 from her vehicle to report the accident, and exited her car while on the telephone to ascertain her location and the extent of the damage to her car.  (State Def. 56.1 ¶¶ 10–11; Pl. State 56.1 ¶¶ 10–11; FD Def. 56.1 ¶ 6; Pl. FD 56.1 ¶ 6.)  At least one other person also called 911 to report the accident.  (State Def. 56.1 ¶ 10; Pl. State 56.1 ¶ 10.)

Plaintiff did not know whether the police or the ambulance arrived at the scene of the accident first, but ultimately the police, ambulance, and tow truck were all present.  (FD Def. 56.1 ¶ 8; Pl. FD 56.1 ¶ 8.)  Two fire chief vehicles and two engine trucks also arrived at the scene of the accident.  (FD Def. 56.1 ¶ 10; Pl. FD 56.1 ¶ 10.)  In total, about eight fire department members were present.  (FD Def. 56.1 ¶ 48; Pl. FD 56.1 ¶ 48.)  According to Plaintiff, except for one bystander who briefly asked if she was injured and left before Plaintiff telephoned 911, there were no bystanders or other members of the public around during the events which followed the emergency response.  (Pl. Aff. ¶ 4; FD Def. 56.1 ¶ 7 (noting one bystander); Pl. Dep. 73:3–16 (same).)

### i.  State Defendants' response

In response to a notification that the accident had occurred, State Defendants arrived on the scene.  (State Def. 56.1 ¶ 12; Pl. State 56.1 ¶ 12; *see also* FD Def. 56.1 ¶ 12.)  When State Defendants arrived on the scene, they spoke with Plaintiff in order to determine what had happened and whether she was injured.  (State Def. 56.1 ¶ 13; Pl. State 56.1 ¶ 13; *see also* FD Def. 56.1 ¶ 13.)  Both then returned to their car to fill out an accident report.  (State Def. 56.1 ¶ 13; Pl. State 56.1 ¶ 13; FD Def. 56.1 ¶ 13.)

### ii. Fire District Defendants' response

Members of the Wantagh Fire District and a tow truck operator also responded to the scene following the 911 calls from Plaintiff and another individual.  (State Def. 56.1 ¶ 14; Pl. State 56.1 ¶ 14.)  Volunteer Fire Chiefs Lindgren and Jackowitz both received the call and reported directly to the scene in their "chief vehicles."  (FD Def. 56.1 ¶ 14; Pl. FD 56.1 ¶ 14.)  Volunteer EMTs and firefighters, including Baranowski and Hutchison, received the alarm call on their pagers and proceeded to the scene of the accident in an ambulance.  (FD Def. 56.1 ¶¶ 15–18; Pl. FD 56.1 ¶¶ 15–18.)  When the ambulance parked at the scene, Baranowski and Hutchison took the basic gear and basic life support ("BLS") equipment from the ambulance and approached Plaintiff's vehicle.  (FD Def. 56.1 ¶¶ 18–19; Pl. FD 56.1 ¶¶ 18–19.)  They saw Plaintiff sitting in the front passenger seat of her vehicle with the door open and the dome light on.  (FD Def. 56.1 ¶ 19; Pl. FD 56.1 ¶ 19.)

According to Fire District Defendants, at this point, Baranowski and Hutchison tried to perform a preliminary patient assessment by asking Plaintiff her name, birthdate, address, social security number and past medical history, but Plaintiff initially refused to provide any information, indicating at first that she did not have or did not know the answer to the questions.  (Baranowski Dep. 187:3–188:22.)  To Baranowski, Plaintiff at first appeared confused, though calm.  (Baranowski Dep. 78:4–20.)  Hutchison perceived that Plaintiff was not speaking normally, but noted that she was not slurring her words either.  (Hutchison Dep. 139:4–13.)  Soon after, around the time when Hutchison asked Plaintiff for her social security number, Plaintiff started to raise her voice and became belligerent, questioning why they needed this information.  (Baranowski Dep. 76:19–79:16; Hutchison Dep. 82:4–82:22, 136:9–145:7.)  The EMTs noticed a sweet odor, possibility indicative of alcohol or of a diabetic crisis, on Plaintiff's

breath, and perceived that Plaintiff's pupils were dilated.[7] (Baranowski Dep. 109:9–24, 231:14–232:6; Hutchison Dep. 145:13–17; *see also* State Def. 56.1 ¶ 18.) The EMTs became concerned that they could not assess Plaintiff's physical or mental status and could not determine "what was wrong with her," why she initially appeared confused and agitated, if she was suffering from a head injury or had some other medical problem.[8] (Hutchison Dep. 148:3–149:6.) Hutchison looked to Baranowski, the higher medical authority on scene, for assistance. (Hutchison Dep. 141:15–142:12.) Baranowski, feeling there was something wrong with Plaintiff's demeanor, recommended to Plaintiff that they take her to the hospital. (Baranowski Dep. 79:9–16, 90:24−91:11; *see also* State Def. 56.1 ¶ 16.) Plaintiff refused to go to the hospital, refused further medical examination, and told them "don't fucking touch me." (Baranowski Dep. 78:14−80:16, 184:25–188:14; *see also* State Def. 56.1 ¶ 17.) Baranowski asked Plaintiff to sign the back of a PCR, which contained an RMA — a place to sign when a patient refuses medical attention. (Baranowski Dep. 79:17−80:16) Plaintiff continued to curse at Baranowski, and told her that Baranowski could not make her sign anything. (Baranowski Dep. 49:11–50:3, 79:17−80:2.) Baranowski and Hutchison continued to be concerned that Plaintiff was acting "fidgety," that she could not sit still and was belligerent, cursing, and yelling for no apparent reason. (Baranowski Dep. 90:24–94:15; Hutchison Dep. 97:5–98:15.) Lindgren, who was standing further away from Plaintiff's vehicle during this exchange, heard Plaintiff yelling and cursing, became concerned for Baranowski's safety because Plaintiff was acting abnormally, and

---

[7] Plaintiff highlights that though the EMTs remember Plaintiff's pupils were dilated, they could not remember that Plaintiff's eyes were blue. (Baranowski Dep. 123:22–24, 232:7–9; Hutchison Dep. 99:13–15.)

[8] Less than twenty-four hours before the incident, Plaintiff had taken her first dose of Lexapro, which had been prescribed to her by a doctor. (State Def. 56.1 ¶ 19; Pl. State 56.1 ¶ 19.) The parties disagree as to what affect, if any, this may have had on Plaintiff.

pulled Baranowski away from Plaintiff.  (Lindgren Dep. 53:15–55:14.)

Plaintiff asserts that when the EMTs first arrived, she was alert, calm and coherent.  (Pl. Counter 56.1 ¶ 27; Baranowski Dep. 78:3–16; Tr. of Dep. of Christopher Nolan dated Dec. 18, 2012, annexed to FD Def. Mot. as Ex. L ("Nolan Dep."), 58:18–21; Tr. of Dep. of Charles Weilminster dated Dec. 19, 2012, annexed to FD Def. Mot. as Ex. M ("Weilminster Dep."), 31:3–5 ("She was normal.").)  She told the EMTs that she felt fine and did not need to go to the hospital, and was more concerned about what would happen to her vehicle and about contacting her mother to come pick her up.  (Pl. Aff. ¶ 5, annexed to Pl. Counter 56.1 as Ex. 3.)  Plaintiff agrees that she was directed to sign a medical release form or be taken to the hospital against her will, but asserts that she was not inclined to do so without understanding the purpose of the form or why she needed to sign it.  (Pl. Aff. ¶¶ 6–7.)  She argues that on her refusal, the emergency responders raised their voices to her.  (Pl. Counter 56.1 ¶ 34; Hutchison Dep. 184:3–7 (admitting that she may have raised her voice to Plaintiff "[m]aybe toward the end . . . when I started to get frustrated.").)

It is undisputed that Plaintiff refused medical attention from the Wantagh Fire District members at the scene of the accident.  (State Def. 56.1 ¶ 34; Pl. State 56.1 ¶ 34.)  Plaintiff was asked to sign the RMA, and was told that she either had to sign the form or go to a hospital.  (FD Def. 56.1 ¶ 30; Pl. FD 56.1 ¶ 30.)  Plaintiff refused to sign the form.  (FD Def. 56.1 ¶ 31; Pl. FD 56.1 ¶ 31.)  Plaintiff did not recall how many times she was asked to sign the form.  (FD Def. 56.1 ¶ 36; Pl. FD 56.1 ¶ 36.)  Sometime after Plaintiff refused to sign the form, Lindgren advised the fire department personnel that they could start packing up to leave the scene.  (FD Def. 56.1 ¶ 49; Pl. FD 56.1 ¶ 49.)

### iii. Plaintiff's arrest

Shortly after the Plaintiff refused to sign the form, Plaintiff requested to speak to the police and a member of the Wantagh Fire District approached the patrol car where the State Troopers were located. (State Def. 56.1 ¶ 20; Pl. State 56.1 ¶ 20; FD Def. 56.1 ¶ 38; Pl. FD 56.1 ¶ 38.) Plaintiff overheard one of the State Troopers, who she believed to be Trooper Nolan, say that she did not have to sign the medical release form. (FD Def. 56.1 ¶ 56; Pl. FD 56.1 ¶ 56.) Plaintiff did not overhear any other part of the conversation between the fire department personnel and the Troopers. (FD Def. 56.1 ¶ 57; Pl. FD 56.1 ¶ 57.)

According to Defendants, Lindgren approached State Defendants, who had returned to their vehicle and closed the doors, and requested assistance with Plaintiff, including assistance in ascertaining her signature on the RMA.[9] (Baranowski Dep. 36:9–36:22, 79:9–80:16, 266:23−267:4; Lindgren Dep. 175:15−176:25; Nolan Dep. 59:8−60:5; Weilminster Dep. 40:21−43:17.) The Fire District personnel informed State Defendants that Plaintiff had been yelling, cursing, and acting irrationally. (Lindgren Dep. 175:15–176:25; Nolan Dep. 61:22–62:8, 69:21–71:20) Trooper Nolan exited his vehicle, heard Plaintiff screaming and using profane and aggressive language, and approached Plaintiff. (Nolan Dep. 74:4–10, 98:5–100:9; Weilminster Dep. 43:18–44:5.) Trooper Nolan eventually returned to where Fire District Defendants were standing and suggested to the fire department persons that he would witness Plaintiff's refusal to

---

[9] Nolan could not recall if the EMTs or fire department personnel asked him to get Plaintiff to sign the medical form. (Nolan Dep. 97:7–13, 100:10–12.) Baranowski recalled asking him to do so, and recalled that Trooper Nolan approached Plaintiff with the form and returned to the Fire District personnel "maybe a minute and a half, two minutes later" to inform them that she refused to sign the RMA. (Baranowski Dep. 36:14–37:8, 80:9–16.)

sign if she did not want to sign the form, and the Fire District accepted that.[10]  (Nolan Dep. 101:4–21; Baranowski Dep. 37:2–8, 80:9–16; Lindgren Dep. 176:23–25.)

Defendants contend that Trooper Nolan approached Plaintiff, at which point she began screaming "fuck you" and other obscenities at him.  (Nolan Dep. 87:11–22; Lindgren Dep. 129:7–130:20.)  Nolan repeatedly warned Plaintiff that if she did not calm down she would be arrested, but she continued to yell obscenities.  (Nolan Dep. 87:23–88:11, 112:21–115:16, 120:5–16; *see also* FD Def. 56.1 ¶¶ 60–63; State Def. 56.1 ¶¶ 23–24.)  Nolan arrested Plaintiff for disorderly conduct and handcuffed her.  (Nolan Dep. 115:12–116:22; *see also* FD Def. 56.1 ¶¶ 63–64; Pl. Counter 56.1 ¶ 46.)  According to Defendants, while Trooper Nolan was attempting to handcuff her, Plaintiff dropped to her knees and lay down on the ground with her hands underneath her body in an attempt to avoid being handcuffed.  (Nolan Dep. 116:6–22, 117:15–19.)  Trooper Weilminster, observing Plaintiff's actions, came over from the State Police vehicle to assist Nolan in handcuffing Plaintiff's hands behind her back.  (Nolan Dep. 118:15−119:3; Weilminster Dep. 47:17–23; *see also* Pl. Counter 56.1 ¶ 40.)

Plaintiff contends that a Trooper, the same one she overheard say she did not have to sign the form, came over to her and informed Plaintiff that she could either sign the form or face arrest.  (Pl. Aff. ¶ 9.)  Plaintiff telephoned her mother from the front seat of her car.  (Pl. Aff. ¶ 10.)  At that point, the Trooper grabbed Plaintiff out of her vehicle and either caused her to fall, pushed her, or "slammed" her onto the grass, causing her to hit her head.  (Pl. Aff. ¶ 11; Pl. Dep. 108:11–113:10.)  Plaintiff alleges that this caused injuries to her arms and knees, as well.  (Pl. Aff. ¶ 11; Pl. Dep. 112:3–19.)  Plaintiff began to cry, but asserts that she did not yell profanities

---

[10]  Nolan did not know what the Fire District Defendants' policy was regarding the RMA, but suggested this to them on his own.  (Nolan Dep. 101:6–102:12.)

to anyone, or use obscene language or gestures.[11]  (Pl. Aff. ¶¶ 12–13, 19.)

### iv.  Plaintiff's transportation to the police barracks

After State Defendants handcuffed Plaintiff, they escorted Plaintiff to their patrol car and seated her in the rear of the vehicle on the passenger side.  (State Def. 56.1 ¶ 27; Pl. State 56.1 ¶ 27.)  When Lindgren observed that Plaintiff was handcuffed and in police custody, he started to release members of the fire department from the scene.  (FD Def. 56.1 ¶ 65; Pl. FD 56.1 ¶ 65.)  Plaintiff remained in handcuffs for approximately five minutes, at which time Plaintiff requested removal of the handcuffs and one of the State Defendants removed them.  (State Def. 56.1 ¶ 28; Pl. State 56.1 ¶ 28.)  Plaintiff then told State Defendants that she wanted to speak with a police supervisor.  (State Def. 56.1 ¶ 29; Pl. State 56.1 ¶ 29.)  Trooper Nolan called the State Police barracks and notified personnel that Plaintiff had requested to speak with a supervisor.  (State Def. 56.1 ¶ 30; Pl. State 56.1 ¶ 30.)

Several minutes later, New York State Police Sergeant David Schneck arrived at the scene, in response to Trooper Nolan's request for a supervisor.  (State Def. 56.1 ¶ 31; Pl. State 56.1 ¶ 31.)  Plaintiff informed Sergeant Schneck that she wanted to lodge a complaint against the Trooper that pulled her out of her car.  (Pl. Aff. ¶ 14.)  Sergeant Schneck transported Plaintiff to the police barracks, located in Farmingdale, in the front seat of his car.  (State Def. 56.1 ¶ 32; Pl. State 56.1 ¶ 32.)  At the barracks, Sergeant Schneck photographed Plaintiff and gave her a

---

[11]  Plaintiff submits that her mother was still on the telephone with Plaintiff when Trooper Nolan pulled her out of the car and pinned her to the ground.  She asserts that her mother heard "a commotion" and heard Plaintiff yell that she would sign the paper.  However, Plaintiff has not submitted a deposition transcript, declaration, or affidavit from her mother, nor done anything more than baldly state that her mother would testify to these facts at trial.  (*See* Pl. Counter 56.1 ¶ 43.)  Plaintiff has failed to produce any evidence of her mother's testimony which would be admissible at trial.  Therefore, the testimony of Plaintiff's mother is not before the Court and has no bearing on the instant motion.

complaint form to complete.  (State Def. 56.1 ¶ 32; Pl. State 56.1 ¶ 32.)  Plaintiff alleges that he also informed her that she was being charged with disorderly conduct.  (Pl. Aff. ¶ 15.)  Plaintiff filled out, but did not sign, the complaint form.  The parties dispute the reason as to why Plaintiff did not sign the complaint.  (State Def. 56.1 ¶ 32; Pl. State 56.1 ¶ 32.)  In her affidavit in opposition to the instant motion, Plaintiff alleges that Sergeant Schneck did not permit Plaintiff to finalize the complaint against the Trooper because "he said he had to investigate the matter further." (Pl. Aff. ¶ 16).  In her deposition and in the hearing following Plaintiff's filing of a notice of claim against the Wantagh Fire District, pursuant to New York General Municipal Law section 50-h, Plaintiff testified that she did not sign the complaint because she was waiting for her sister, who is also her counsel, to arrive.  (Pl. Dep. 156:8–157:2; Tr. of Hrg. Pursuant to Sec. 50-h, dated Dec. 17, 2009, annexed to FD Def. Mot. as Ex. E ("50-h Tr.") 55:20–56:4, 68:15−69:14.)  Sergeant Schneck also recalls Plaintiff refusing to sign the complaint, though she was given the opportunity to do so.  (Tr. of Schneck Dep., annexed to Decl. of Dorothy Nese in Support of State Def. Mot. for Summary Judgment ("Nese Decl.") as Ex. J ("Schneck Dep.") 116:23–117:15.)

At some point, Sergeant Schneck called the East Farmingdale Fire Department to the police station, where Plaintiff again refused medical attention.  (State Def. 56.1 ¶ 34; Pl. State 56.1 ¶ 34.)  In the meantime, Trooper Nolan had returned to the police barracks in Farmingdale. (State Def. 56.1 ¶ 33; Pl. State 56.1 ¶ 33.)  There, he processed Plaintiff's arrest paperwork, charging her with disorderly conduct.  (State Def. 56.1 ¶ 33; Pl. State 56.1 ¶ 33.)  Plaintiff was presented with a desk appearance ticket and released into the custody of her family.  (State Def. 56.1 ¶ 33; Pl. State 56.1 ¶ 33.)

### v. Plaintiff's hospitalization

After leaving the police station, Plaintiff went to Franklin Hospital with her brother, where she presented herself in the emergency room complaining of "bruises and possible head contusion due to police brutality," and injury to her wrists and right elbow. (State Def. 56.1 ¶ 34; Pl. State 56.1 ¶ 34.) The emergency room records also reflect that Plaintiff complained that the police "grabbed her." (Emergency Department Triage, annexed to Nese Decl. as Ex. L.) Plaintiff was discharged and did not receive any further treatment for injuries she allegedly sustained as a result of the April 28, 2009 incident. (State Def. 56.1 ¶ 36; Pl. State 56.1 ¶ 36.)

### d. Reports filed subsequent to April 28, 2009

Fire District Defendants were required to complete and submit a PCR following the April 28, 2009 incident. The PCR includes boxes for the patient's pedigree information, agency codes, date and time of the alarm, and for subjective and objective assessments of the treatment rendered to the patient. (FD Def. 56.1 ¶ 77; Pl. FD 56.1 ¶ 77.) Hutchison began to complete the pedigree section of the PCR report at the scene on April 28, 2009. (FD Def. 56.1 ¶ 67; Pl. FD 56.1 ¶ 67.) Baranowski completed the report in the back of the ambulance and at the fire station, after which it was faxed to dispatch and put into a slot at the station "to be sent to New York State as required." (FD Def. 56.1 ¶¶ 67–68; Pl. FD 56.1 ¶¶ 67–68.)

### e. Disorderly conduct charges

Ultimately, the charge of disorderly conduct under N.Y. Penal Law section 240.20 was dismissed on motion of Plaintiff's attorney. (State Def. 56.1 ¶ 33; Pl. State 56.1 ¶ 33.) The District Court, Nassau County, First District Criminal Term, found the factual allegations supporting the charge of disorderly conduct, as written, were "facially insufficient" to establish that there was probable cause to arrest Plaintiff for disorderly conduct. (*See People v. Lozada*,

Index No. 2009NA011994 (Dist. Ct. Sept. 2, 2009), annexed to Pl. Counter 56.1 as Ex. 4.).

Plaintiff was required to appear in court "[a]bout three times" to have the charges dismissed.

(50-h Tr. 58:24–59:4.)

## II. Discussion

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most

favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic*

*Sec., LLC*, 558 F. App'x 89, 89 (2d Cir. 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843

(2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013); *Redd v. N.Y. Div. of*

*Parole*, 678 F.3d 166, 173 (2d Cir. 2012). The role of the court is not "to weigh the evidence

and determine the truth of the matter but to determine whether there is a genuine issue for trial."

*Redd*, 678 F.3d at 173–74 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

A genuine issue of fact exists when there is sufficient "evidence on which the jury could

reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla

of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the

jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after

resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational

juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir.

2000).

### b. Section 1983 Fourth Amendment claims

Plaintiff has alleged four separate claims arising from violations of her Fourth

Amendment rights against all Defendants: (1) false arrest, (2) excessive force, (3) malicious

prosecution, and (4) unlawful seizure.[12]  The Court discusses each claim individually below.

### i. False arrest

In assessing Fourth Amendment claims of false arrest brought under Section 1983, courts generally look to the law of the state in which the arrest is alleged to have occurred.  *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007).  To prevail on a false arrest claim under New York law, a plaintiff has to prove that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged."  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (alteration and internal quotation marks omitted) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)); *see also Ackerson v. City of White Plains,* 702 F.3d 15, 19 (2d Cir. 2012) (outlining the elements of false arrest claims).  "The existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest.'"  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see also Ackerson*, 702 F.3d at 19–20 (citing *Weyant*, 101 F.3d at 852, for probable cause analysis).  "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime[.]'"  *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant,* 101 F.3d at 852); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (same).  Such knowledge or information can be based on information provided by an eyewitness, unless the circumstances would raise a doubt as to the

---

[12]  Plaintiff does not raise parallel state law tort claims for any of the alleged violations.

eyewitness' veracity. *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer,* 63 F.3d at 119). The question is whether the facts known to the arresting officer, at the time of the arrest, objectively provided probable cause to support the arrest. *Gonzalez*, 728 F.3d at 155.

### 1. State Defendants

It is undisputed that both Trooper Nolan and Trooper Weilminster were involved in arresting Plaintiff and handcuffing her, that she was aware of their actions, and that she did not consent to them. Thus, whether State Defendants are liable for false arrest turns on whether the confinement was privileged, that is, whether they had probable cause to arrest Plaintiff.

State Defendants argue that they had probable cause to arrest Plaintiff, which is justification for the arrest and a complete defense to an action for false arrest. (State Def. Mem. 21.) State Defendants contend that the information provided to them by the Wantagh Fire Department members was sufficient to provide State Defendants with probable cause to arrest Plaintiff for disorderly conduct. (State Def. Reply Mem. 2–3.) State Defendants further assert that "Plaintiff cannot prove that the State Defendants lacked probable cause to arrest and prosecute her . . . ." (State Def. Reply Mem. 3.) For the following reasons, the Court finds that genuine issues of fact exist and a reasonable jury could find that State Defendants lacked probable cause to arrest Plaintiff.

Under New York Law, a person is guilty of the violation of disorderly conduct when:

> with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: 1. He engages in fighting or in violent, tumultuous or threatening behavior; or 2. He makes unreasonable noise; or 3. In a public place, he uses abusive or obscene language, or makes an obscene gesture; or 4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or 5. He obstructs vehicular or pedestrian traffic; or 6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or 7. He creates a hazardous or physically offensive condition by any act

which serves no legitimate purpose.

N.Y. Penal Law § 240.20.  The Second Circuit has held "that probable cause for a disorderly conduct violation under N.Y. Penal Law [section] 240.20 exists only where a reasonable person in the officer's circumstances would have believed that the person to be arrested acted 'with intent to cause public inconvenience, annoyance or alarm or with recklessness as to a risk thereof.'"  *McClellan v. City of Rensselaer*, 395 F. App'x 717, 718 (2d Cir. 2010) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001)) (internal quotation marks omitted); *see also Swartz*, 704 F.3d at 111 ("'The disorderly conduct statute at issue here does not circumscribe pure speech directed at an individual.  Rather, it is directed at words and utterances coupled with an intent to create a risk of public disorder . . .'" (quoting *People v. Tichenor*, 89 N.Y.2d 769, 775 (1997))).  "To demonstrate the existence of probable cause for disorderly conduct as a matter of law, [the defendant] was required to show that no reasonable jury could have failed to find such a reasonable belief."  *McClellan*, 395 F. App'x at 718 (citing *Provost*, 262 F.3d at 157); *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) ("[P]robable cause 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest,' and [] the probable cause inquiry is objective rather than subjective." (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152–53 (2004))).

The existence of probable cause turns on what information State Defendants had at the time of Plaintiff's arrest.  The record reflects two conflicting versions of Plaintiff's behavior at the scene.  Defendants contend that Plaintiff was behaving in a belligerent manner, making unreasonable noise and using obscene language.  Plaintiff contends that she was not, and points to both her own and Defendants' testimony which indicates that Plaintiff was "calm" and "normal" at points throughout her short interaction with the State Troopers and Wantagh Fire

District members.  Even accepting as fact the testimony that Fire District members told the Troopers that Plaintiff was using obscene language and being very loud, Trooper Nolan thereafter had an opportunity to observe Plaintiff, and, by her account, she was at that point very calm.  Furthermore, there is insufficient evidence in the record to conclude as a matter of law that the information provided to the State Troopers would necessarily support a finding that Plaintiff intended to create a risk of public disturbance.  Drawing all reasonable inferences in favor of the non–moving party, there is a genuine issue of fact as to whether State Defendants had probable cause to arrest Plaintiff.  *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996) ("Probable cause exists when there are 'facts and circumstances sufficient to warrant a prudent man that the [suspect] had committed or was committing an offense.'" (alteration in original) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).  Though State Defendants' version of events is corroborated by others at the scene, namely the Fire District Defendants, it is not the Court's province at summary judgment to determine credibility of the various witnesses. *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996))); *Graham v. City of New York*, 928 F. Supp. 2d 610, 617 (E.D.N.Y. 2013) (collecting cases). Accordingly, the Court finds that a genuine issue of fact exists as to whether State Defendants had probable cause to arrest Plaintiff for the disorderly conduct violation.  State Defendant's motion for summary judgment as to Plaintiff's false arrest claim is denied.

### 2.    Fire District Defendants

Fire District Defendants argue that because they are non-police actors, the Plaintiff must show that they took an active role in Plaintiff's arrest, "such as giving advice and encouragement

or importuning the authorities to act, and that the defendant intended that the plaintiff be confined." (FD Def. Mem. 11–12.) Fire District Defendants also argue that Plaintiff failed to show that Baranowski, Hutchison or Lindgren instigated her arrest or persuaded the State Troopers to arrest her. (FD Def. Mem. 12–13; FD Def. Reply Mem. 19.) They contend that the evidence shows they did nothing more than request the assistance of the Troopers. (FD Def. Mem. 12.) Plaintiff argues that Fire District Defendants instigated her arrest, and that State Defendants would not have placed her under arrest had Fire District Defendants not requested their assistance in obtaining the signature on the RMA form. (Pl. Opp'n Mem. 18.) She further argues that the Fire District Defendants and State Defendants conspired to bring about her arrest, and the events that followed. (*Id.*)

The first prong of a false arrest claim, intent to confine, may be shown by evidence that a defendant either (a) actually confined or intended to confine a plaintiff himself, or (b) "affirmatively procured or instigated the plaintiff's arrest." *King v. Crossland Sav. Bank*, 111 F.3d 251, 256 (2d Cir. 1997) (citations omitted). To show instigation, a plaintiff must show that a defendant did more than simply provide information to the police. *Id.* at 257; *see also Kraft v. City of New York*, 696 F. Supp. 2d 403, 422 (S.D.N.Y. 2010) ("[A] complainant, by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed, will not be held liable for false arrest or malicious prosecution.") *aff'd,* 441 F. App'x 24 (2d Cir. 2011). "Under New York law, '[o]ne who wrongfully accuses another of criminal conduct and induces or procures that person's arrest may be liable for false arrest.'" *Croft v. Greenhope Servs. for Women, Inc.*, No. 13-CV-2996, 2013 WL 6642677, at *5 (S.D.N.Y. Dec. 17, 2013) (alterations in original) (quoting *Dunn v. City of Syracuse*, 443 N.Y.S.2d 463, 464

(App. Div. 1981)) (citing *Vernes v. Phillips*, 266 N.Y. 298 (1935)); *see also Hill v. Melvin*, No. 05-CV-6645, 2006 WL 1749520, at *11 (S.D.N.Y. June 27, 2006) *aff'd,* 323 F. App'x 61 (2d Cir. 2009).

Plaintiff relies heavily on the "secretive conversation" between Fire District Defendants and State Defendants. (Pl. Opp'n Mem. 18.) However, Plaintiff's speculation about what Fire District Defendants said to State Defendants is insufficient to create a genuine issue of fact about what information Fire District Defendants provided State Defendants, and whether or not they can be said to have "instigated" or "procured" Plaintiff's arrest. Even assuming Plaintiff was calm and was not yelling or gesticulating, and Fire District Defendants still told State Defendants that Plaintiff was behaving irrationally, yelling and cursing, (*see* Lingdren Dep. 175:15–176:25; Nolan Dep. 61:23–62:8), the inaccurate information provided to the State Troopers cannot be said to have "instigated" Plaintiff's arrest. As discussed above, Trooper Nolan had the opportunity to observe Plaintiff and make his own determination as to whether her behavior warranted arrest.

Plaintiff also argues that Fire District Defendants were acting "in concert" with State Defendants to violate her rights. (Pl. Opp'n Mem. 18.) She argues that their secretive conversation, only one part of which she heard, creates a genuine issue as to whether Fire District Defendants and State Defendants conspired to have her falsely arrested. (Pl. Opp'n Mem. 18.) Fire District Defendants contend that Plaintiff has failed to establish a conspiracy between State Defendants and any of Fire District Defendants which would give rise to liability for her arrest. (FD Def. Mem. 13–14.) Fire District Defendants argue that Baranowski and Hutchison were merely performing their duties as NYS-certified EMTs and were in good faith attempting to either assess Plaintiff's mental and physical status, or to determine whether she

needed to be transported to a hospital.  (FD Def. Mem. 14.)  Fire District Defendants further

contend that when Plaintiff repeatedly refused to sign the form and "started yelling," Chief

Lindgren instructed all of the Fire District personnel to stay away from Plaintiff.  (FD Def. Mem.

15.)  They contend that the most any of the individual Fire District Defendants did was inform

the State Troopers that Plaintiff was acting erratically and yelling at the EMTs.  (FD Def. Mem.

15.)

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or

more state actors or between a state actor and a private entity; (2) to act in concert to inflict an

unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."

*Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Young v. Cnty. of Fulton*, 160

F.3d 899, 904 (2d Cir. 1998); *Singer*, 63 F.3d at 119.  Put differently, a third party may be liable

for conspiracy to violate constitutional rights when he or she "'is a willful participant in joint

activity with the State or its agents.'"  *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir.

2002) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)).

The only evidence before the Court shows that the conversation between the State

Troopers and any Fire District member is that Lindgren and/or Baranowski (1) obtained the

attention of the State Troopers, who were sitting in their vehicle with closed doors and windows,

(2) informed them that Plaintiff was yelling, screaming, and being belligerent, (3) indicated that

Plaintiff did not want to be touched, (4) asked for help because Plaintiff was behaving

irrationally, and (5) may have asked the Troopers for assistance in obtaining a signature on the

RMA.  (Lindgren Dep. 175:2–176:25; Baranowski Dep. 80:3–16; Nolan Dep. 71:11–23;

Weilminster Dep. 40:21–43:17.)  Plaintiff admits that she "couldn't hear anything that they

said," and "all I know is that the police officer who seemed to be on my side now turned against

me and threatened to arrest me if I didn't abide by what they were asking." (Pl. Dep. 233:7–17.)

Plaintiff has not shown sufficient evidence that could lead a reasonable jury to conclude that Defendants agreed to "act in concert to inflict an unconstitutional injury," and thus cannot hold Fire District Defendants liable under a theory of conspiracy liability. *See Pangburn*, 200 F.3d at 72. Plaintiff's own unsubstantiated speculation and allegations do not support finding a genuine issue of material fact as to the alleged conspiracy. *See Scotto v. Almenas*, 143 F.3d 105, 114–15 (2d Cir. 1998) (finding allegations that a communications took place insufficient to show conspiracy, noting that "the non-moving party may not rely on conclusory allegations or unsubstantiated speculation") (citations omitted); *see also Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (upholding dismissal of complaint that contained only "conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights" noting it "fail[ed] to plausibly allege the existence of a conspiracy among the defendants"); *Carrillos v. Inc. Vill. of Hempstead*, --- F. Supp. 3d ---, ---, 2015 WL 728244, at *6 (E.D.N.Y. Feb. 20, 2015) ("[T]he summoning of police officers or the provision of information to police officers, even if that information is false or results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of Section 1983." (citing *Ginsberg v. Healey Car & Truck Leading, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999))).

Fire District Defendants' motion for summary judgment as to Plaintiff's false arrest claim is granted.

### ii. Excessive force

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer" in the course of an arrest. *Tracy v. Freshwater*, 623 F.3d. 90, 96 (2d Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Because the Fourth Amendment's

test of reasonableness is one of "objective reasonableness," the inquiry is fact specific and requires a balancing of various factors. *Id.*; *see also Wims v. N.Y.C. Police Dep't*, No. 10-CV-6128, 2011 WL 2946369, at *4 (S.D.N.Y. July 20, 2011) ("When excessive force is alleged, a court must determine 'whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" (quoting *Graham*, 490 U.S. at 397)). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Tracy*, 623 F.3d at 96 (citing *Graham*, 490 U.S. at 397). A court considers the totality of the circumstances when determining whether excessive force was used against a plaintiff. *Tracy*, 623 F.3d at 96. When determining whether an officer's actions constitute excessive force, a court considers: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy*, 623 F.3d at 96 (citations omitted); *see also Nimkoff v. Dollhausen*, 751 F. Supp. 2d 455, 463 (E.D.N.Y. 2010) ("[T]he fact finder must consider the totality of the circumstances, including 'the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest.'" (citations omitted)). Viewing the facts in the light most favorable to Plaintiff, the Court finds that a reasonable jury could find that excessive force was used against Plaintiff by State Defendants.

### 1. State Defendants

State Defendants claim that Plaintiff cannot maintain an excessive force claim because removing Plaintiff from her vehicle was *de minimis* force, State Defendants used no more force than necessary to handcuff her, and they removed the handcuffs as soon as Plaintiff requested

they be removed.[13]  (State Def. Mem. 17.)  Defendants argue that the use of handcuffs was

appropriate given the circumstances, particularly because the handcuffing of arrestees is standard

procedure and the handcuffs were removed after approximately five minutes, as soon as Plaintiff

requested they be removed.  (State Def. Reply Mem. 6.)  State Defendants also argue that the

photographs taken at the State Police barracks shortly after the incident show no injuries, and

merely minor reddening of the skin on her wrists and insider her elbow, which Plaintiff had

described as resulting from contact with the air bag during the impact.  (State Def. Mem. 17.)

Viewing the facts in the light most favorable to Plaintiff, Plaintiff has established a genuine issue

of fact as to whether Trooper Nolan used excessive force in removing her from her car and

handcuffing her.  *See Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123–24 (2d Cir. 2004)

(noting that the Second Circuit has found that "allegations that police yanked arrestee out of a

car, threw her against it, and pinned her arm behind her back were sufficient to withstand

summary judgment" (citing *Robison v. Via*, 821 F.2d 913, 923–24 (2d Cir. 1987)).

　　　According to Plaintiff, she was sitting peacefully in her car, attempting to make a

telephone call, when Trooper Nolan approached her.  Trooper Nolan grabbed her, dragged her

from her vehicle, pushed her to the ground, and, with the assistance of Trooper Weilminster,

handcuffed her behind her back.  (Pl. Aff. ¶ 11; Pl. Dep. 108:11–113:10.)  Viewing the facts in

---

[13]　State Defendants allege that Trooper Nolan "clearly had probable cause to arrest
Plaintiff," making the minimal force exercised to remove Plaintiff from her car reasonable, and
the use of handcuffs reasonable.  (State Def. Reply Mem. 4.)  However, as discussed above,
whether State Defendants had probable cause to arrest Plaintiff is an issue properly determined
by a jury.  Furthermore, even assuming State Defendants had probable cause to arrest Plaintiff,
the use of force and handcuffs, though it may be standard procedure, is not *per se* acceptable.
*Soares v Connecticut*, 8 F.3d 917, 921 (2d Cir. 1993) (rejecting the adoption of "a per se rule that
the use of handcuffs in effecting an arrest is always reasonable"); *see also Arum v. Miller*, 331 F.
Supp. 2d 99, 110 (E.D.N.Y. 2004) ("Although placing handcuffs on an individual being arrested
is generally reasonable, that act is not per se reasonable.").

the light most favorable to Plaintiff, whether Trooper Nolan even had probable cause to arrest

her is questionable, and there is no indication that she was trying to resist arrest. Plaintiff visited

the hospital following her departure from the police barracks, and complained of injuries

including bruised wrists. (Pl. Dep. 196:12–197:10, 201:13–19.) She also testified that she

informed the hospital staff that she had sustained an injury to hear head and knees. (Pl. Dep.

194:6–197:10.) A reasonable jury could find that no force was warranted, and that forcibly

removing Plaintiff from her car and handcuffing her was excessive force. *See*, *e.g.*, *Robison*, 821

F.2d at 923–24 (holding that forcibly removing nonviolent plaintiff from her car could be

excessive force); *Lemmo v. City of New York*, No. 08-CV-2641, 2011 WL 4592785, at *8

(E.D.N.Y. Sept. 30, 2011) (holding that tightening "handcuffs . . . to their maximum, for

apparently gratuitous reasons" along with kneeing the plaintiff in his back could be excessive

force); *Hamilton v. City of New York*, No. 07-CV-3633, 2009 WL 2226105, at *9 (E.D.N.Y. July

23, 2009) (holding that "purposely tripp[ing] [the plaintiff] while he was being escorted, in

handcuffs, . . . causing him to fall to the floor and cut his face" could be excessive force);

*Davenport v. Cnty. of Suffolk*, No. 99-CV-3088, 2007 WL 608125, at *11 (E.D.N.Y. Feb. 23,

2007) (holding that an officer intentionally hitting the plaintiff's head into the top of the police

car as the plaintiff was being placed in the police car could be excessive force); *see also Maxwell

v. City of New York*, 380 F.3d 106, 109–10 (2d Cir.) (reversing the district court's entry of

summary judgment against a plaintiff who had suffered only "minor scrapes, bumps or bruises

[that] potentially could occur, often unintended, during any arrest," pain, and post-concussive

syndrome, as a result of police officer allegedly shoving her, causing her to hit her head)

*supplemented*, 108 F. App'x 10 (2d Cir. 2004).

State Defendants are liable for excessive force as long as the force used exceeded the

force needed given the totality of the circumstances. *Weather v. City of Mount Vernon*, No. 08-CV-192, 2011 WL 1046165, at *11 (S.D.N.Y. Mar. 22, 2011) ("Under the law, police are not permitted to use any degree of force in all instances — in some circumstances, no use of force is reasonable because none is required."), *aff'd*, 474 F. App'x 821 (2d Cir. 2012). While the Court acknowledges that in certain cases the alleged unconstitutional act and injury can be *de minimis* and may not rise to the level of excessive force, intentional or "gratuitous" force may be excessive under the circumstances, even if the only injury is minimal. *Davenport*, 2007 WL 608125, at *11; *see also Amnesty Am.*, 361 F.3d at 123–24 (distinguishing the kind of force that can be used when arresting nonviolent suspects passively resisting arrest); *De Michele v. City of New York*, No. 09-CV-9334, 2012 WL 4354763, at *13–14 (S.D.N.Y. Sept. 24, 2012) ("To determine whether the handcuffing of an arrestee was reasonable, the handcuffing must be viewed 'in light of the minimal amount of force necessary to maintain custody of [the arrestee].'" (alteration in original) (citations omitted)). The fact that Plaintiff may not have sustained serious injuries or been subject to long-lasting harm is not dispositive. *See Hayes v. N.Y.C. Police Dep't,* 212 F. App'x 60, 62 (2d Cir. 2007) ("[W]e have permitted claims to survive summary judgment where the only injury alleged is bruising.") (citations omitted); *Hayes v. Cnty. of Sullivan*, 853 F. Supp. 2d 400, 432 (S.D.N.Y. 2012) ("Plaintiff need not show 'permanent or severe' injuries to maintain an excessive force claim," minor injuries may be sufficient. (quoting *Robison*, 821 F.2d at 924)); *Lemmo*, 2011 WL 4592785, at *8 (noting that a reasonable "jury may consider the lack of serious injury as evidence that the implemented force was not excessive;" and still conclude that any force used under the circumstances was inappropriate under the circumstances (internal quotation marks and citations omitted)).

Under the totality of the circumstances, viewing the facts in the light most favorable to

Plaintiff, a reasonable jury could find that the force used by State Defendants was excessive. According to Plaintiff, she was sitting peacefully in her car and not attempting to resist arrest, when Trooper Nolan grabbed her and handcuffed her, and Trooper Weilminster ran over to assist in putting the handcuffs on.  While Trooper Nolan pulled Plaintiff from her car, both State Defendants placed handcuffs on her, and Plaintiff testified that both held her to the ground while handcuffing her and escorted her back to the police car.  (50-h Tr. 48:15–49:5; Pl. Dep. 118:3−12.)  While it is undisputed that Plaintiff's handcuffs were removed as soon as she requested them to be, complaining that they were too tight, there are sufficient disputes as to the other facts surrounding her arrest, removal from her car, and handcuffing.  These persistent disputes of fact make summary judgment on Plaintiff's excessive force claim inappropriate. *Lemmo*, 2011 WL 4592785, at *8 (holding that under the totality of the circumstances, plaintiff's claim that his handcuffs were tightened along with related physical force was enough to create a question of fact for the jury); *Arum v. Miller*, 331 F. Supp. 2d 99, 110 (E.D.N.Y. 2004) (denying the defendant's summary judgment motion on an excessive force claim for handcuffing where there were disputes of fact as to whether handcuffing was warranted where the plaintiff was only arrested for "minor violations"); *Gonzalez v. City of New York*, No. 98-CV-3084, 2000 WL 516682, at *4 (E.D.N.Y. Mar. 7, 2000) (holding that the "plaintiff, who was undisputedly not resisting arrest, was dragged to the front of the police car, slammed against the hood of the vehicle and forcibly handcuffed . . . [and] placed in very tight handcuffs" even though they were "quickly adjusted," raised an issue of fact for the jury whether the force used against him was excessive).

The Court denies State Defendants' motion for summary judgment as to Plaintiff's excessive force claim.

### 2. Fire District Defendants

Fire District Defendants argue that there is no evidence that Hutchison, Baranowski or Lindgren encouraged and requested State Defendants to apply intimidation or force to Plaintiff. (FD Def. Reply Mem. 18.)  Plaintiff contends that they "played an active role in threatening her, involving the police to threaten her, and then conspiring to have Plaintiff transported against her will or arrested," and they "encouraged and requested that the State Defendants apply intimidation or force to the Plaintiff . . . ."  (Pl. Opp'n Mem. 17.)

For the reasons discussed above, Plaintiff has failed to present evidence to support her speculation regarding what Fire District Defendants discussed with State Defendants and otherwise has not shown sufficient facts to support her theory of conspiracy.  "Allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983." *Younger v. City of New York*, 480 F. Supp. 2d 723, 733 (S.D.N.Y. 2007) (quoting *Alfaro Motors, Inc. v. Ward*, 814 F.2d 883, 887 (2d Cir. 1987) (internal quotation marks and alteration omitted)) (dismissing excessive force claim against defendants not alleged to have participated in an arrest and assault).  Furthermore, Plaintiff has not alleged the personal involvement of any of Fire District Defendants in the circumstances on which she bases her excessive force claims.  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013) ("It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." (citations omitted)).

Fire District Defendants' motion for summary judgment as to Plaintiff's excessive force claim is granted.

### iii. Malicious prosecution

Plaintiff asserts a malicious prosecution claim based on the issuance of a desk appearance ticket for disorderly conduct, which she argues was issued because she filed a complaint against Troopers Nolan and Weilminster. (Pl. Opp'n Mem. 19) Under New York law, the elements of a malicious prosecution claim are "(1) the initiation or continuation of a criminal proceeding against plaintiff, (2) termination of the proceeding in plaintiff's favor, (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Morris v. Silvestre*, --- F. App'x ---, ---, 2015 WL 1061124, at *1 (2d Cir. Mar. 12, 2015) (quoting *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010)) (internal quotation marks omitted); *see also Lewis v. City of New York*, 591 F. App'x 21, 22 (2d Cir. 2015) (stating the elements of a malicious prosecution claim under New York law); *Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) (same); *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (same); *Adams v. City of New York*, 993 F. Supp. 2d 306, 325 (E.D.N.Y. 2014) (same). In addition, a plaintiff must show a "sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rutigliano v. City of New York*, 326 F. App'x 5, 8–9 (2d Cir. 2009) (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000)).

#### 1. State Defendants

State Defendants argue that they had probable cause to arrest Plaintiff, which is justification for Plaintiff's prosecution. (State Def. Mem. 21.) The Court has addressed this issue above, in Part II.b.i.1 of this Memorandum and Order, and will not do so again here. State Defendants further contend that the dismissal of the disorderly conduct charges against Plaintiff were not "terminated in her favor" as required to sustain a malicious prosecution claim. (State Def. Mem. 22–23.)

To state a claim for malicious prosecution, a plaintiff must "demonstrate a final termination of the criminal proceeding in her favor, or at least 'not inconsistent with [her] innocence.'" *Okoi v. El Al Israel Airlines*, 378 F. App'x 9, 11 (2d Cir. 2010) (alteration in original) (quoting *Smith–Hunter v. Harvey*, 95 N.Y.2d 191, 196 (2000)). Dismissals based on legal insufficiency generally do not satisfy the favorable termination element. *See Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) ("The charge subsequently was dismissed for facial insufficiency pursuant to section 170.30 of New York's Criminal Procedure Law. Because this was not a decision on the merits, an essential element of a cause of action for malicious prosecution, the district court did not err in dismissing [plaintiff's] claim of malicious prosecution."); *Gem Fin. Serv., Inc. v. City of New York*, No. 13-CV-1686, 2014 WL 1010408, at *10 (E.D.N.Y. 2014) (collecting cases). This is, in part, because a dismissal for legal insufficiency lacks the requisite finality to constitute a *termination*. *See Smith-Hunter v. Harvey*, 95 N.Y.2d 191, 197 (2000) ("[A] plaintiff in a malicious prosecution action must show, as a threshold matter, that the criminal proceeding was *finally* terminated. Indeed, it is well settled that any disposition of the criminal action which does not terminate it but permits it to be renewed . . . cannot serve as a foundation for the [malicious prosecution] action." (alterations in original) (citation and internal quotation marks omitted)); *McGee v. Doe*, 568 F. App'x 32, 39–40 (2d Cir. 2014) (discussing *MacFawn v. Kresler*, 88 N.Y.2d 859 (1996), in light of *Smith-Hunter* and concluding that dismissal was not final because facts did not show "the formal abandonment of the proceedings by the public prosecutor" (quoting *Smith-Hunter*, 95 N.Y.2d at 198)).

The Order issued by the Queens County Criminal Court shows that the court dismissed the accusatory instrument alleging a violation of N.Y. Penal Law section 240.20 for facial

insufficiency. (*See People v. Lozada*, Index No. 2009NA011994 (Dist. Ct. Sept. 2, 2009), annexed to Pl. Counter 56.1 as Ex. 4.) The court concluded that the accusatory instrument lacked factual allegations supporting one element of the alleged violation, namely, that "there is no indication that the [Plaintiff's] act carried public ramification as the nature and number of those attracted to the incident is not articulated . . . ." and thus dismissed the instrument pursuant to New York Criminal Procedure Law section 170.30(1)(a). (*Id.*) This alone is insufficient to show that the charge was finally terminated in her favor.[14] *McGee*, 568 F. App'x at 39 (upholding dismissal of Section 1983 malicious prosecution claim, finding charge dismissed as facially insufficient under New York Criminal Procedure Law section 170.30(1)(a) had not terminated in plaintiff's favor as required by New York law) (citing *Breen*, 169 F.3d at 153 and *MacFawn v. Kresler*, 88 N.Y.2d 859 (1996)) *as amended* (July 2, 2014). The Court grants State Defendants' motion for summary judgment as to Plaintiff's malicious prosecution claim.

## 2. Fire District Defendants

Fire District Defendants argue that the facts unequivocally establish that Baranowski,

---

[14] Plaintiff has done nothing more than present conclusory arguments, without citations to controlling or persuasive authority, that the dismissal constituted a termination in her favor. Under New York law, there are two ways to establish a favorable termination: (1) an adjudication on the merits, or (2) an act of withdrawal or abandonment on the part of the prosecuting authority. *See Morgan v. Nassau Cnty.*, No. 03-CV-5109, 2009 WL 2882823, at *8 (E.D.N.Y. 2009) (quoting *O'Brien v. Alexander*, 101 F.3d 1479, 1486 (2d Cir. 1996)). Here, as in *McGee*, "there was no indication that the dismissal of the action against [Plaintiff], and the failure by the prosecution to re-file the claim, constituted a formal abandonment of the charges." *See McGee v. Doe*, 568 F. App'x 32, 40 (2d Cir. 2014) *as amended* (July 2, 2014). In this action, there is no act or action on the part of the government to similarly support the conclusion that the charges against Plaintiff were formally and finally abandoned. *Cf. Stampf v. Long Island R. Co.*, 761 F.3d 192, 201 (2d Cir. 2014) (finding that under New York law, issuance of formal declination of prosecution may suffice to establish termination in the plaintiff's favor even if the prosecutor could theoretically reinstate charges). Thus, in the particular circumstances presented here, there is no evidence in the record to indicate that the dismissal was a final termination in Plaintiff's favor, and it is therefore proper to grant summary judgment as to Plaintiff's claim for malicious prosecution.

Hutchison and Lindgren did not in any way initiate judicial proceedings against Plaintiff and did not direct the State Trooper to arrest Plaintiff or otherwise initiate the proceedings against her. (FD Def. Mem. 17.) Plaintiff argues that Fire District Defendants sought the assistance of the State Troopers for the specific purpose of orchestrating her arrest, and arguing that if it was not for their request, Plaintiff would not have been arrested or charged. (Pl. Opp'n Mem. 20.) For the reasons discussed above, the Court grants summary judgment to Fire District Defendants as to Plaintiff's malicious prosecution claim.

### iv. Unlawful seizure

Plaintiff argues that the same alleged actions which give rise to Plaintiff's claim for false arrest also support a claim for unlawful seizure of her person. (Pl. Opp'n Mem. 17.) A Section "1983 claim for false arrest derives from [a plaintiff's] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly*, 439 F.3d at 151 (citing *Weyant*, 101 F.3d at 852). Because Plaintiff does not allege a search or seizure beyond the actions supporting her false arrest claim, Plaintiff's unlawful seizure claim is subsumed by her other Fourth Amendment claims, analyzed above. *See Lastra v. Barnes & Noble Bookstore*, No. 11-CV-2173, 2012 WL 12876, at *5 (S.D.N.Y. Jan. 3, 2012) (noting three causes of action for unlawful seizure, unlawful detainment and unlawful imprisonment have the same elements as each other and as claims for false arrest and false imprisonment) (citing *Copeland v. N.Y. City Police Dep't*, 97-CV-4224, 1998 WL 799169, *2 (S.D.N.Y. Nov. 13, 1998)) *aff'd,* 523 F. App'x 32 (2d Cir. 2013).

### c. Section 1983 First Amendment retaliation

Plaintiff argues that she was arrested for refusing to sign the RMA portion of the form, in violation of her First Amendment right to refuse to provide personal information as well as the

right to refuse to sign the paperwork. (Pl. Opp'n Mem. 12–13.) Plaintiff also argues that even if the Defendants' version of events were true, Plaintiff had a First Amendment right to yell profanities on a public highway in the middle of the night. (Pl. Opp'n Mem. 13.)

To prevail on a First Amendment retaliation claim, a plaintiff must show: (1) she has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by her exercise of that right; and (3) the defendant's actions caused her injury. *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (citing *Curley,* 268 F.3d at 73); *see also Prince v. Cnty. of Nassau*, 563 F. App'x 13, 17 (2d Cir. 2014) (quoting *Dorsett*, 732 F.3d at 160, for First Amendment retaliation standard, noting that *Dorsett* clarified former standard); *Crichlow v. Fischer*, No. 12-CV-7774, 2015 WL 678725, at *4 (S.D.N.Y. Feb. 17, 2015) (quoting *Dorsett*, 732 F.3d at 160, for standard, noting "a plaintiff must show 'either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm'").

### i. State Defendants

#### 1. Motivation

State Defendants concede that Plaintiff had a right under the First Amendment to refuse to sign the RMA form as requested by Fire District Defendants. (State Def. Mem. 11.) State Defendants argue, however, that Plaintiff's argument fails on the second prong of the test because State Defendants had probable cause to arrest and charge Plaintiff with the crime of Disorderly Conduct, a violation of New York Penal Law section 240.20. (*Id.* 11–14.) State Defendants' argue that their perception of Plaintiff's behavior, which is corroborated by the testimony of Fire District Defendants, including her screaming and using obscenities and refusal to comply with Trooper Nolan's admonition to stop her behavior or face arrest, gave State

Defendants probable cause to arrest Plaintiff. (*Id.* 13–14.) State Defendants further argue that "[s]pecific proof of improper motivation is required" to survive summary judgment on a First Amendment retaliation claim, and that Plaintiff's "only support for her baseless claim is" the bare allegation that State Defendants maliciously and intentionally set out to deprive her of a constitutional right. (State Def. Mem. 14.) State Defendants also argue that a "reduc[tion] to pure speculation," is not an adequate basis for a First Amendment animus claim. (State Def. Reply Mem. 5 (quoting *Haus v. City of New York*, 2011 U.S. Dist. LEXIS 155735, at *76 (S.D.N.Y. Aug. 31, 2011) (Report & Recommendation).)

"Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim." *Curley*, 268 F.3d at 73 (citing *Blue v. Koren*, 72 F.3d 1075, 1082–83 (2d Cir. 1995)); *Prince*, 563 F. App'x at 17 (finding that plaintiff did not raise a genuine issue of material fact as to whether defendants were motivated by retaliatory animus rather than a good-faith desire to enforce certain licensed premise codes). "[T]he particularized evidence of improper motive may include expressions by the officials involved regarding their state of mind, circumstances suggesting in a substantial fashion that the plaintiff has been singled out, or the highly unusual nature of the actions taken." *Bartels v. Inc. Vill. of Lloyd*, 751 F. Supp. 2d 387, 399 (E.D.N.Y. 2010) (quoting *Blue*, 72 F.3d at 1084) (internal quotation marks omitted). To survive summary judgment, a plaintiff need only demonstrate that the speech was a substantial or motivating factor in an adverse decision taken by the defendant. *Royal Crown Day Care LLC v. Dep't of Health & Mental Hyg. of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (citing *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 152 (2d Cir. 2006)). If both proper and improper motivations were behind defendants' conduct, the action may be upheld if it would have been taken based on proper reasons alone.

*See Santulli v. Russello*, 519 F. App'x 706, 709 (2d Cir. 2013) (citing *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)).

Plaintiff has raised a genuine issue of material fact as to whether the Trooper Nolan was motivated by improper retaliatory animus, rather than a good-faith desire to enforce the disorderly conduct law.[15]  According to her affidavit and testimony, Plaintiff was sitting calmly in her car, calmly refused to sign the RMA form, and was instructed by Trooper Nolan that she needed to sign the form or she would face arrest.  (Pl. Aff. ¶¶ 9–13; Pl. Dep. 101:25–104:24, 107:17–108:20.)  She contends that she was not yelling or shouting obscenities at any time leading up to her arrest.  Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could infer from the circumstances that Trooper Nolan was motivated to arrest her because she refused to sign the form.  *See Bartels*, 751 F. Supp. 2d at 399 (finding that plaintiff had raised issues of fact as to police officers' motive based on circumstantial evidence, including statements of officers made in response to plaintiff's protected conduct).

However, Plaintiff has not made any showing as to Trooper Weilminster's motivation, and Trooper Weilminster testified that he merely ran over to assist Trooper Nolan when he noticed him struggling.  (Nolan Dep. 116:6–22, 118:15–119:3; Weilminster Dep. 47:17–23; *see also* Pl. Counter 56.1 ¶ 40.)  There are insufficient facts to sustain a finding that Weilminster was motivated by retaliatory animus.

---

[15]  Plaintiff argues that she is entitled to judgment as a matter of law on the point of whether Defendants had probable cause to arrest her because her desk appearance ticket for disorderly conduct was dismissed for facial insufficiency.  (Pl. Opp'n Mem. 13.)  The facts presented before the Court are different from the facts presented on the desk appearance ticket, and the facts as presented here show that there is a genuine issue of material fact as to whether State Defendants had probable cause to arrest Plaintiff.

## 2. Injury

State Defendants further argue that even if they lacked probable cause to arrest Plaintiff and they were motivated by Plaintiff's exercise of her First Amendment rights, the circumstances show that their actions did not chill Plaintiff's exercise of those rights, because Plaintiff never signed the RMA form.  (State Def. Mem. 14.)  Plaintiff argues that her speech was chilled because, upon her arrest, she yelled that she would sign the form, which was "the intended result for all of the [D]efendants."  (Pl. Opp'n Mem. 14.)

The Second Circuit has recently clarified that Plaintiff's speech need not be chilled to satisfy the third prong of the test.  To prevail on the third prong of the test, a plaintiff must show either that her speech was adversely affected by defendant's actions, or that she has suffered some other concrete harm.  *Dorsett*, 732 F.3d at 160 ("Chilled speech is not the *sine qua non* of a First Amendment claim."); *Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011) ("Where chilling is not alleged, other forms of tangible harm will satisfy the injury requirement, since 'standing is no issue whenever the plaintiff has clearly alleged a concrete harm independent of First Amendment chilling.'" (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 383 (2d Cir. 2004))); *Glacken v. Inc. Vill. of Freeport*, No. 09-CV-4832, 2014 WL 1836143, at *7 (E.D.N.Y. May 8, 2014) ("[A] plaintiff has standing [on a First Amendment Retaliation claim] if he can show *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm." (quoting *Prince*, 2014 WL 145379, at *3 (internal quotation marks omitted))).  "[A] criminal prosecution is a sufficient form of concrete harm for purposes of a First Amendment retaliation claim."  *Norton v. Town of Brookhaven*, No. 13-CV-3520, 2014 WL 4700250, at *3 (E.D.N.Y. Sept. 18, 2014) (citations omitted); *see also Brink v. Muscente*, No. 11-CV-4306, 2013 WL 5366371, at *8 (S.D.N.Y. Sept. 25, 2013) ("It is well-settled that the

First Amendment 'prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out.'" (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)).

Plaintiff has presented evidence, in the form of her testimony, which could support a finding that Trooper Nolan arrested her for, and charged her with, disorderly conduct because she refused to sign the RMA form. Plaintiff testified that Trooper Nolan told her she could sign the form or face arrest, (Pl. Aff. ¶ 9; Pl. Dep. 101:25–104:24, 107:17–108:20), and the evidence indicates that Trooper Nolan did arrest her and processed her paperwork for the disorderly conduct charge, (State Def. 56.1 ¶ 33; Pl. State 56.1 ¶ 33). Accordingly, the Court finds that Plaintiff has created a question of fact as to whether she has sustained an injury that was causally connected to her exercise of First Amendment rights. *See Norton*, 2014 WL 4700250, at *4 (reinstating dismissed claim of First Amendment retaliation when allegations showed defendants prosecuted plaintiff for town code violations closely following protected activity); *see also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002) (alleging retaliatory revocation of building permit); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) (alleging retaliatory failure to enforce zoning laws).

For the foregoing reasons, the Court grants State Defendants' motion for summary judgment as to Plaintiff's First Amendment retaliation claim against Trooper Weilminster, but denies the motion as to Plaintiff's First Amendment retaliation claim against Trooper Nolan.

### ii.   Fire District Defendants

Fire District Defendants argue that based on a totality of the circumstances, including Plaintiff's confused, erratic and agitated behavior and the fact that completion of the form was mandated by New York State, "it cannot be said that chilling the Plaintiff's purported protected

speech or conduct" was a substantial or motivating factor of the EMTs actions. (FD Def. Mem. 10) Fire District Defendants also argue that the evidence shows that the EMTs were attempting to execute their duties to assess a patient and provide care in good faith, but upon multiple refusals of medical attention and refusal to sign the form by Plaintiff, they had the State Trooper witness her refusal to sign the form, and the EMTs and other fire district members packed up and went back to the station. (FD Def. Reply Mem. 17.)

Plaintiff has not presented evidence that would create a genuine issue of material fact as to the motivation of Fire District Defendants' actions toward her. Plaintiff's only evidence as to Fire District Defendants' motivation is their repeated request that she sign the form, their communication with the State Troopers, and the fact that she overheard one of the State Troopers say that Plaintiff did not have to sign the medical release form. While the evidence may suggest that Fire District Defendants hoped to persuade Plaintiff to sign the form, there is nothing to suggest that they intended to suppress her ultimate right to refuse to sign, or were otherwise involved in orchestrating her subsequent arrest. Thus, the Court grants Fire District Defendants' motion for summary judgment as to Plaintiff's First Amendment retaliation claim.

### d. Section 1983 due process claims

#### i. Fifth Amendment

Defendants argue that Plaintiff's claim for denial of due process under the Fifth Amendment fails as a matter of law because the Fifth Amendment due process clause applies only to federal officials. (State Def. Mem. 19; State Def. Reply Mem. 6–7; FD Def. Mem. 17; FD Def. Reply Mem. 20.) "Because the Fifth Amendment applies only to the federal government, Plaintiff cannot state a claim for deprivation of due process in violation of the Fifth Amendment where, as here, there are no allegations of federal action." *Cortlandt v. Westchester*

*Cnty.*, No. 07-CV-1783, 2007 WL 3238674, at \*5 (S.D.N.Y. Oct. 31, 2007) (citing *Taylor v. Evans,* 72 F. Supp. 2d 298, 305 n.3 (S.D.N.Y. 1999)); *see also Cassidy v. Scoppetta*, 365 F. Supp. 2d 283, 286 (E.D.N.Y. 2005) (dismissing Section 1983 claim for Fifth Amendment violation, noting that "[t]he Fifth Amendment 'governs the conduct of the *federal* government and *federal* employees, and does not regulate the activities of state officials or state actors'" (quoting *Dawkins v. City of Utica*, 1997 WL 176328, \*4 (N.D.N.Y. April 4, 1997)). The Court grants the motions for summary judgment as to Plaintiff's Fifth Amendment claims.

### ii. Fourteenth Amendment

Plaintiff argues that she suffered multiple deprivations of liberty in violation of the due process clause of the Fourteenth Amendment, including: (1) being handcuffed; (2) being held at the police barracks until she was presented with a desk appearance ticket; and (3) being made to appear in court three times to contest the charges of disorderly conduct. (Pl. Opp'n Mem. 20.)

To the extent Plaintiff's Fourteenth Amendment claims are based on what she alleges to be a "brutal attack[]," State Defendants argue that these claims are properly analyzed under the Fourth and not the Fourteenth Amendment, and thus her Fourteenth Amendment claim should be dismissed. (State Def. Mem. 20; State Def. Reply Mem. 7.) State Defendants further argue that Plaintiff "does not cite to any procedural defects in the manner in which she was arrested, charged or prosecuted." (State Def. Reply Mem. 7.) Rather, her complaints appear to center around the manner and circumstances of her arrest, handcuffing and detention. (*Id.*) Fire District Defendants argue that there is no evidence that they deprived Plaintiff of life, liberty or property, and argue that they did not instigate Plaintiff's arrest or persuade the State Trooper to arrest her, and did not otherwise have any involvement in any alleged deprivation. (FD Def. Mem. 18; FD Def. Reply Mem. 20.)

Plaintiff's Fourteenth Amendment due process claims sound in false arrest, malicious prosecution, and excessive force, and are properly analyzed under the Fourth Amendment. "Where 'the Fourth Amendment provides an explicit textual source of constitutional protection against [a type] of physically intrusive governmental conduct, that Amendment, not the more generalized notion of substantive due process, must be the guide for analy[sis] . . . .'" *Maliha v. Faluotico*, 286 F. App'x 742, 744 (2d Cir. 2008) (quoting *Graham*, 490 U.S. at 395) (alterations in original) (noting claims relating to the defendants' falsification of documents and exaggerating claims, which stemmed from the same set of actions as the plaintiff's Fourth Amendment claims, "merge[d]" with the Fourth Amendment claims); *see also Bryant v. City of New York*, 404 F.3d 128, 135 (2d Cir. 2005) ("[W]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." (quoting *Albright v. Oliver*, 510 U.S. 266, 275 (1994) (plurality opinion)) (internal quotation marks and alterations omitted)); *De La Cruz v. City of New York*, No. 11-CV-8395, 2014 WL 3719164, at *7 (S.D.N.Y. June 26, 2014) ("The allegations put forth in support of [p]laintiff's Fourteenth Amendment claim — *i.e* ., that Plaintiff's search and arrest were effectuated without probable cause — are duplicative of those forming the basis of his claim under the Fourth Amendment, and thus no general substantive due process claim lies."[16] (citing

---

[16]  To the extent Plaintiff is also attempting to assert a false arrest claim for holding her for an unreasonable amount of time while she awaited the issuance of a desk appearance ticket, Plaintiff has failed to establish (1) the officers required her to wait while they prepared the desk appearance ticket, and (2) that she was held for an unreasonable amount of time. *See Bryant v. City of New York*, 404 F.3d 128, 138 (2d Cir. 2005) (finding that "plaintiffs fall well short of any showing that the refusal to issue desk appearance tickets to them immediately following their arrests and processing was objectively unreasonable"). Furthermore, Plaintiff's testimony indicates that she requested to go to the barracks, that she remained at the barracks to fill out a

*Albright*, 510 U.S. at 273 and *Maliha*, 286 F. App'x at 744)); *Levantino v. Skala*, --- F. Supp. 3d ---, ---, 2014 WL 5537818, at *9 (E.D.N.Y. Nov. 3, 2014) ("Plaintiff's procedural due process claim cannot be predicated upon the same factual basis as his Fourth Amendment false arrest and false imprisonment claims. . . . Therefore, to the extent the Plaintiff seeks to assert a procedural due process claim based on the same conduct supporting his false arrest and false imprisonment claims, that request is denied as futile and duplicative.")  The Court grants the motions for summary judgment as to Plaintiff's Fourteenth Amendment claims.

**e. Section 1983 conspiracy**

As discussed above, Plaintiff's vague and conclusory allegations do not satisfy the requirements to establish a conspiracy between Fire District Defendants and State Defendants to violate her constitutional rights.  Furthermore, to the extent Plaintiff attempts to do so, Plaintiff cannot show that a conspiracy existed between the State Defendants, as no such claim can stand because the State Troopers were both part of the same entity.[17]  The Court therefore grants summary judgment to all Defendants as to Plaintiff's conspiracy claim.

---

complaint against State Defendants, and that she further remained there awaiting the arrival of her family members, not that she was held there pending the issuance of a desk appearance ticket.  (Pl. Dep. 144:19–146:6, 151:18–152:15, 156:11–157:2, 164:9–18.)

[17] *See Little v. City of New York*, 487 F. Supp. 2d 426, 441–42 (S.D.N.Y. 2007) (granting summary judgment to two police officers alleged to have engaged in conspiracy with one another under Sections 1983 and 1985, noting that "[u]nder the intracorporate conspiracy doctrine, the officers, agents, and employees of a single corporate entity, each acting within the scope of her employment, are legally incapable of conspiring together" (internal quotation marks and citations omitted)); *see also Talley v. Brentwood Union Free Sch. Dist.*, 728 F. Supp. 2d 226, 233 (E.D.N.Y. 2010) ("Under the intracorporate conspiracy doctrine, officers, agents and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring together." (citing *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (applying intracorporate conspiracy doctrine to Section 1985 conspiracy claim)).

**f. Section 1983 qualified immunity**

Plaintiff argues that Defendants are not entitled to qualified immunity because their actions violated well-established constitutional rights, and it was not objectively reasonable for Defendants to behave as they did. (Pl. Opp'n Mem. 24.) As discussed above, Plaintiff has presented sufficient facts from which a reasonable jury could find that State Defendants are liable for her false arrest and excessive force claims and that Trooper Nolan is responsible for her First Amendment claim. *Gilles v. Repicky*, 511 F.3d 239, 245 (2d Cir. 2007) (noting that right to be free from arrest without probable cause is clearly established); *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995) (right to be free from excessive force is clearly established). Nevertheless, State Defendants could still be immune from the claims if their actions were objectively reasonable.

"[A] decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. ---, ---, 131 S. Ct. 2074, 2080 (2011)); *see also Morris*, --- F. App'x at ---, 2015 WL 1061124, at *2 (Qualified immunity "shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known." (quoting *Lowth*, 82 F.3d at 568–69) (internal quotation marks omitted)); *Manganiello*, 612 F.3d at 164 (discussing the elements of qualified immunity). Defendants bear the burden of proof to establish that qualified immunity exists. *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011).

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that State Defendants are not immune from Plaintiff's Section 1983 claims for false arrest and excessive force and that Trooper Nolan is not immune from her First Amendment retaliation claim.

### i.  False arrest

State Defendants contend that they are entitled to qualified immunity as to Plaintiff's Section 1983 claim for false arrest because the facts, when read in the light most favorable to Plaintiff, do not show that an objectively reasonable officer in State Defendants' position would have known he was violating a clearly established constitutional right.  (State Def. Mem. 26.) State Defendants point to the fact that members of the Wantagh Fire District gave them information about Plaintiff's behavior, and they observed Plaintiff's erratic behavior, which provided them with probable cause to arrest Plaintiff.  State Defendants argue that this shows that it was objectively reasonable for State Defendants to believe that their actions did not violate clearly established law.  (State Def. Mem. 27; State Def. Reply Mem. 10–12.)

For Fourth Amendment violations including false arrest, "[a]n officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of the arrest — that is, if officers of reasonable competence could disagree on whether the probable cause test was met." *Gonzalez*, 728 F.3d at 157 (quoting *Jenkins v. City of New York*, 478 F.3d 76, 86–87 (2d Cir. 2007)) (internal quotation marks omitted); *Morris*, --- F. App'x at ---, 2015 WL 1061124, at *2 ("Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)) (false arrest and malicious prosecution).

Based on the testimony, the Fire District members did inform State Defendants that

Plaintiff had been yelling obscenities at them on the highway, which may weigh in support of finding "arguable probable cause." *See Morris*, --- F. App'x at ---, 2015 WL 1061124, at *2 (affirming grant of summary judgment on qualified immunity grounds when finding of probable cause was a "close call because it was supported by little more than the complaint by an individual whose preexisting, antagonistic relationship with [plaintiff] was known to the police"). However, given Plaintiff's testimony that she was calm and quiet when Trooper Nolan approached her, and her assertion that she was arrested for her refusal to sign the form, a jury must resolve the factual issues surrounding the arrest before the Court can make a determination as to whether qualified immunity was warranted as a matter of law. Taking the facts in the light most favorable to the Plaintiff, a reasonable jury could conclude that Tooper Nolan's actions were not objectively reasonable when he arrested and charged Plaintiff with disorderly conduct because of the fact that she was behaving only in a calm and quiet manner. *See Gilles*, 511 F.3d at 247 ("If on the undisputed facts [defendant] unreasonably concluded he had probable cause, or if disputed material issues of fact precluded a determination of probable cause, then summary judgment was inappropriate."); *Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001) (noting defendant would not have been entitled to qualified immunity as a matter of law if a reasonable jury could find facts inconsistent with the objective reasonableness of defendant's arresting plaintiff for disorderly conduct).

### ii. Excessive force and First Amendment claims

State Defendants argue that they are entitled to qualified immunity on Plaintiff's other claims. State Defendants insist that the totality of the circumstances, including what they believe to have been probable cause, coupled with the small amount of force used and short amount of time Plaintiff was in handcuffs, illustrate the objective reasonableness of their actions. (State

Def. Mem. 27; State Def. Reply Mem. 10–12.)[18]

"A grant of qualified immunity allows public officials to be 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kennedy v. Lehman*, 328 F. App'x 16, 18–19 (2d Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (finding summary judgment warranted when First Amendment right in question not clearly established); *Lennon*, 66 F.3d at 425 ("[T]the question for the purposes of qualified immunity [on an excessive force claim] is 'whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances.'" (quoting *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994))).

Here, Defendants do not dispute that the rights Plaintiff asserts were clearly established, but rather argue that their actions were objectively reasonable in light of the circumstances. However, whether Trooper Nolan took any action against Plaintiff in retaliation for her exercise of a First Amendment right, what force was used when State Defendants arrested Plaintiff, and whether the amount of force State Defendants used when arresting Plaintiff was excessive, are

---

[18] Fire District Defendants also argue that Baranowski, Hutchison and Lindgren are entitled to qualified immunity because they all acted in good faith in performing their duties with respect to the Plaintiff. They argue that each individual Fire District Defendant responded to a 911 call requesting emergency assistance, attempted to discharge their professional duties while on the scene of an emergency, and attempted to provide proper and appropriate medical care to Plaintiff. (FD Def. Mem. 22.) Fire District Defendants further argue that their actions reflected an objectively reasonable belief that their actions were lawful. (FD Def. Mem. 24.) Because the Court grants summary judgment to Fire District Defendants on all of Plaintiff's Section 1983 claims, the Court declines to decide whether Fire District Defendants would be entitled to qualified immunity.

all questions of fact for the jury to determine.[19]  Furthermore, given the conflicting versions of

events presented by Plaintiff and State Defendants, it is possible that a reasonable jury could find

facts that are inconsistent with a determination that State Defendants' actions were objectively

reasonable.  *See Chepilko v. City of New York*, No. 06-CV-5491, 2012 WL 398700, at *8

(E.D.N.Y. Feb. 6, 2012) ("Because, under plaintiff's view of the facts, there was no reason

whatsoever to believe that plaintiff presented any harm justifying his restraint through the use of

handcuffs, defendants . . . are also not entitled to summary judgment on the basis of qualified

immunity.")  Thus, the Court denies State Defendants' motions for summary judgment on the

grounds of qualified immunity.

### g.   Section 1983 municipal liability

Plaintiff argues that the Wantagh Fire District should be held liable for Fire District

Defendants' violations of her civil rights pursuant to Section 1983 because (1) it established

unwritten procedures and policies that encouraged the alleged violations, (2) individual Fire

District members were specifically trained to engage in the acts which led to the alleged

violations, and (3) the alleged violations were sanctioned by Lindgren, the Fire Chief, whom

Plaintiff alleges to be a policy-maker.  (Pl. Opp'n Mem. 22–23.)  Fire District Defendants

---

[19]  *But cf. Lennon v. Miller*, 66 F.3d 416, 426 (2d Cir. 1995) ("It was objectively reasonable for [defendant] to believe that in pulling the plaintiff from the car to effect her arrest, he was not infringing on her Fourth Amendment rights.")  In *Lennon*, the Second Circuit determined that defendant police officers were entitled to summary judgment for an excessive force claim on qualified immunity grounds when they pulled a plaintiff out of her car and she sustained a very minor wrist injury.  The Court found that "[u]nder the circumstances described above, no jury could find that it was objectively unreasonable for the officers to believe that the force used to remove Mrs. Lennon from the car was not excessive."  *Id.*  However, in *Lennon*, the undisputed facts showed that the defendant officers were objectively reasonable in believing they had probable cause to arrest Plaintiff, a conclusion that cannot be reached on the facts of this case before the Court.  Furthermore, Plaintiff in the instant action alleges that she sustained more than minor wrist injuries, including a head injury.

contend that Plaintiff has presented nothing but her own conclusory allegations to sustain her claim that the Wantagh Fire District has established an unwritten policy or custom to protect its volunteer firefighters from civil liability "by arranging for a potential claimant to be arrested without probable cause and based on false allegations." (FD Def. Mem. 19.)

In order to sustain a claim for relief pursuant to Section 1983 against a municipal defendant, a plaintiff must show the existence of an official policy or custom that caused injury, and a direct causal connection between that policy or custom and the deprivation of a constitutional right. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694–95 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."); *see Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010) ("[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." (alteration in original) (quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007))). *Monell* does not provide an independent separate cause of action against a municipality; "it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citing *Monell*, 436 U.S. at 694 and *City of Canton v. Harris*, 489 U.S. 378 (1989)); *see Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) ("Establishing the liability of the municipality requires a showing that the plaintiff suffered a tort in violation of federal law committed by the municipal actors and, in addition, that their commission of the tort resulted

from a custom or policy of the municipality." (citing *Monell*, 436 U.S. at 690–91 and *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012))).

Because the Court has determined that Plaintiff has not shown an underlying constitutional violation by the individual Fire District Defendants, the Wantagh Fire District cannot be held liable for a constitutional violation under *Monell*. Thus, the Court grants Fire District Defendants' motion for summary judgment as to municipal liability.

### h. State law negligence

Plaintiff also brings a state law negligence action under New York common law. State Defendants urge the Court to decline to exercise supplemental jurisdiction over all state law claims, assuming the dismissal of all federal claims. (State Def. Mem. 28; State Def. Reply Mem. 12.) Because the Court has not dismissed all of Plaintiff's federal actions, State Defendants' motion cannot succeed on this ground. All Defendants also argue that Plaintiff's state law claims fail as a matter of law.

Plaintiff alleges in her complaint that the Defendants were negligent in the performance of their duties, in training/and or supervision of their employees or agents, which caused a deprivation of Plaintiff's constitutional rights. (Compl. ¶¶ 8–9.) Plaintiff also alleges that she sustained personal injury as a result of such negligence. (Compl. ¶ 40.) Plaintiff argues that Defendants negligently breached the duty to (1) refrain from infringing on her constitutional rights, (2) accurately report incidents on official documents, (3) refrain from making false statements, (4) respect Plaintiff's "personal and privacy rights," and (5) respect Plaintiff's right to refuse to be examined or to sign a legal document. (Pl. Opp'n Mem. 21.)

To the extent Plaintiff is seeking relief for any alleged constitutional violations, Plaintiff cannot sustain a negligence claim for deprivation of constitutional rights. *See Salim v. Proulx*,

93 F.3d 86, 92 (2d Cir. 1996) ("A claim that a state actor acted negligently does not state a deprivation of constitutional rights." (citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986) and *Davidson v. Cannon*, 474 U.S. 344, 348 (1986))); *see also Fuller v. Lantz*, 549 F. App'x 18, 21 (2d Cir. 2013) (affirming grant of summary judgment on Eighth Amendment claim because evidence showed only negligence, "which is insufficient to make out a constitutional violation") (citing *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). While Plaintiff is generally permitted to plead different causes of action in the alternative, other District Courts in this Circuit have held that when a plaintiff's factual allegations are "only consistent with a theory of intentional, or perhaps reckless, conduct," negligence claims must be dismissed. *See Eze v. City Univ. of N.Y. at Brooklyn Coll.*, No. 11-CV-2454, 2011 WL 6780652, at *6 (E.D.N.Y. Dec. 27, 2011) (collecting cases); *see also Antonious v. Muhammad*, 673 N.Y.S.2d 158, 159 (App. Div. 1998) ("A plaintiff seeking damages for an injury resulting from a wrongful arrest and detention 'may not recover under broad general principles of negligence . . . but must proceed by way of the traditional remedies of false arrest and imprisonment.'" (citing *Boose v. City of Rochester*, 421 N.Y.S.2d 740, 744)).

Beyond her false arrest, excessive force and First Amendment retaliation claims, Plaintiff has not shown any evidence that her vague allegations of negligence can survive. As a preliminary matter, Plaintiff cannot maintain a suit sounding in ordinary negligence against the individual Fire District Defendants, pursuant to New York State General Municipal Law section 205-b. *See Lynch v. Waters*, 922 N.Y.S.2d 884, 887 (App. Div. 2011) ("The plain language of the statute thus reflects the Legislature's dual purposes in enacting section 205–b: first, *to immunize volunteer firefighters from civil liability for ordinary negligence* and, second, to shift liability for such negligence to the fire districts that employ them.") (emphasis added).

Furthermore, as to her allegations of other negligent behavior, Plaintiff has not shown that Defendants owed a duty to her, breached that duty, or caused her injury other than that addressed above. *See In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 758 F.3d 202, 210 (2d Cir. 2014) (To establish a *prima facie* case of negligence under New York law, "a plaintiff must show '(1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty, and (3) injury to the plaintiff as a result thereof.'" (quoting *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 428 (2d Cir. 2013))); *Jiminez v. Shahid*, 922 N.Y.S.2d 123, 124 (App. Div. 2011) ("The elements of a common-law negligence cause of action are a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately resulting there from.").

All Defendants' motions for summary judgment as to Plaintiff's negligence claims are granted.

### i. Punitive Damages

Plaintiff argues that she is entitled to punitive damages as a remedy because Defendants acted egregiously and willfully, because Defendants acted in accordance with unconstitutional customs and policies, and because of what Plaintiff alleges to be the "falsification" of incident reports and deposition testimony relating to the April 28, 2009 incident, which show malice on the part of Defendants. (Pl. Opp'n Mem. 25.) State Defendants oppose Plaintiff's claim for punitive damages. (State Def. Reply Mem. 10.)

Punitive damages are available to a plaintiff bringing a Section 1983 claim who has shown that defendants acted with "'reckless or callous disregard for plaintiff's rights and intentionally violates federal law.'" *Lazaratos v. Ruiz*, No. 00-CV-2221, 2003 WL 22283832, at *7 (S.D.N.Y. Sept. 30, 2003) (quoting *Smith v. Wade*, 461 U.S. 30, 45, 51 (1983)); *see also Williams v. Cnty. of Nassau*, No. 10-CV-4815, 2014 WL 4101545, at *9 (E.D.N.Y. Aug. 18,

2014) ("Plaintiff's account of the arrest and alleged beating raises an issue of material fact as to violation of his constitutional rights and provides sufficient indication, for summary judgment purposes, that officers were motivated by the requisite 'ill will or malice.'") (quoting *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 909 (2d Cir. 1993)); *Lin v. Cnty. of Monroe*, --- F. Supp. 3d ---, ---, 2014 WL 7202153, at *16 (W.D.N.Y. Dec. 8, 2014) ("Punitive damages are available in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" (quoting *Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir. 1996))). Generally, the issue of whether defendants' conduct is sufficiently serious to warrant punitive damages is a question best left to the jury. *Lin*, --- F. Supp. 3d at ---, 2014 WL 7202153, at *16 (collecting cases); *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 613 (S.D.N.Y. 2013); *Picciano v. McLoughlin*, 723 F. Supp. 2d 491, 506 (N.D.N.Y. 2010) (denying motion for summary judgment as to punitive damages on excessive force claim when there were factual disputes as to whether plaintiff resisted arrest and the amount of force used to effectuate the arrest). Given the issues of fact that remain to be resolved by a jury, the Court declines to grant State Defendants' motion for summary judgment as to Plaintiff's claim for punitive damages at this juncture.

### III. Conclusion

For the foregoing reasons, the Court denies State Defendants' motion for summary judgment as to Plaintiff's claims for false arrest and excessive force against Trooper Nolan and Trooper Weilminster, Plaintiff's claim for First Amendment retaliation against Trooper Nolan, qualified immunity, and punitive damages. The Court grants State Defendants' motion for summary judgment as to Plaintiff's malicious prosecution, unlawful seizure, due process, conspiracy and negligence claims against both Defendants, as well as State Defendants' motion

for summary judgment as to Plaintiff's First Amendment retaliation claim against Trooper

Weilminster.  Fire District Defendants' motion for summary judgment is granted in its entirety.

SO ORDERED:


_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 23, 2015
       Brooklyn, New York